# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **PAULINE RUMBLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:09-499-KD-B |
| | ) |
| **AUSTAL USA,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## ORDER

Before the Court are Defendant Austal USA ("Austal")'s motion for summary judgment (Docs. 20, 21, & 22), objections and motion to strike (Doc. 29) Plaintiffs' response to Defendant's Determinations of Undisputed Fact and Conclusions of Law and Plaintiff's Undisputed Facts, and reply in support of summary judgment (Doc. 30). Also before the Court are Plaintiff Pauline Rumbley ("Rumbley")'s opposition to the motion for summary judgment (Docs. 26, 27, & 28), along with Plaintiff's motion to strike (Doc. 32) new evidence submitted by the Defendant in its reply brief and Defendant's motion to strike. For the reasons set forth below, Defendant's motion for summary judgment (Doc. 20) is **DENIED in part** and **CARRIED to trial in part**, Defendant's motion to strike (Doc. 29) is **GRANTED in part** and **DENIED in part**, and Plaintiff's motion to strike (Doc. 32) is **DENIED as moot**.

**I. Summary Judgment Standard**

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).[1] The

---

[1] Rule 56(c)(2) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:
(Continued)

party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment also always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

---

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56 (c).

## II. Background Facts[2]

Rumbley filed an EEOC Charge of Discrimination in July of 2008 and her complaint on August 5, 2009. (Doc. 1). Jurisdiction is alleged pursuant to Title 28 United States Code, Sections 1331, 1343(3), 2201, and 2202, and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. Section 2000e et. seq. (Id. (Compl. ¶ 1)).

Rumbley started work with Austal on January 3, 2006, as a purchasing agent. (Doc. 28-5, p. 2 (Performance Eval. for 1/2006 to 6/2006); Doc. 21-8, p 2 (EEOC Charge of Discrimination)). Austal evaluated Rumbley in June of 2006 and again in June of 2007. (Doc. 28-5, pp. 2-15 (Performance Evals. for 1/2006 to 6/2006 and 7/2006 to 6/2007)). On each of these evaluations, Rumbley received ratings of good/effective to excellent/very effective. (Id.). Both evaluations assessed her potential as "[d]eveloping in line with the job." (Id.). The assessing manager commented on her 2006 evaluation:

> Pauline is a pleasure to have at Austal as the MRO buyer. Long-term, Pauline will need to work longer hours in order to progress as a buyer for HSF or LCS. Pauline needs to continually seek out the advice of her internal customers and needs to proactively work to reduce outstanding issues that could arise. Erin would like for Pauline to concentrate on reducing the amount of open invoice issues she has. Pauline needs to take more ownership for her MRO spend and bring possible cost savings opportunities to Erin's attention so we can work to centralize Austal's spend among few suppliers.

(Id., p. 8 (Performance Eval. for 1/2006 to 6/2006)). The following year, the assessing manager wrote:

---

[2] In resolving this motion for summary judgment, the Court construes the evidence and the factual allegations in a light most favorable to the plaintiffs. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (When ruling on a motion for summary judgment, the court "should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.").

> Pauline is an asset to the purchasing department. She processes <u>ALL</u> of the overhead requisitions for Austal. She is doing the job of at least three (3) buyers. She never asks for support from others. She is self-motivated and very reliable. Pauline is intelligent, hardworking, and easy to work with.

(<u>Id.</u>, p. 15 (Performance Eval. for 7/2006 to 6/2007)).

Austal hired Terry Schroeder ("Schroeder") in November 2007 "to help get purchasing and subcontract departments up to speed with Austal's growth rate at the time," and Schroeder became Daniel "Dan" May ("May")'s boss. (Doc. 21-2, p. 3 (May Aff. ¶ 4). May subsequently became Plaintiff's supervisor. In connection with

> th[e] modernization process [Schroeder was hired to put in place], Schroeder instituted a shift in Austal's purchasing model from a traditional tactical purchasing model to a modern strategic purchasing model. Tactical purchasing is a process whereby an employee gets an order and places the order[, and] is not very cost-efficient. Strategic purchasing, . . . is a model whereby the agent assesses the company's current spending, assesses the supply market or potential suppliers, usually gets formal bids from multiple suppliers, evaluates risks or costs associated with those suppliers, negotiates with suppliers, engages in a cost analysis, and then sources the company's business based on the cost analysis and what [the agent] has learned about the company, the quality of its product(s), service(s), cost(s) . . . , etc.

(<u>Id.</u>). As a result of this new initiative, "employees in the new supply chain management department[, such as Rumbley,] were tasked with becoming more strategic, rather than tactical, in their purchasing . . . and the demands of employees in the new department were different than they had been in the outdated purchasing and subcontract departments." (<u>Id.</u>, p. 4 ¶ 5).

In late 2007, Austal decided to move Pauline Rumbley from Kirsten Bradford's supervision to May's supervision and to change her title to "Subcontract Agent." (Doc. 21-2, p. 3 (May Aff. ¶ 3); Doc. 21-8, p 2 (EEOC Charge of Discrimination)). Before May officially became Rumbley's supervisor on January 1, 2008, he received a complaint about her performance from an Austal employee named Jerrod Bradford ("Bradford"). (Doc. 21-2, pp. 5 &

43 (May Aff. ¶ 8 & Email from Jerrod Bradford to May); Doc. 21-4, p. 4 (Kirsten Bradford Dep. 31:16-19)). Specifically, Bradford complained that an expedited order request he had placed with Rumbley was not fulfilled until 8 calendar days after the order was placed. (Doc. 21-2, p. 3 (May Aff. ¶ 8)). Kirsten Bradford, Rumbley's supervisor at the end of 2007, also apprised May of certain concerns she had regarding Rumbley's performance before May officially became Rumbley's supervisor. (Doc. 28-2, pp. 4- 7 (May Dep. 65:1-68:10)).

"In the first few months [] after Rumbley came to work for [May] in the beginning of 2008," May "began receiving complaints from Chris Jackson [("Jackson"),] Jeff Schaus ("Schaus")[3] . . ., and Jerrod Bradford . . . ." (Doc. 21-2, p. 5 (May Aff. ¶ 8)). Schaus, specifically, "complained early on in May's supervision about Rumbley's lack of responsiveness." (Id., p. 6 ¶ 9). And "Bradford had continuing issues . . . with how [Rumbley] handled a major supplier to his department . . . [: (Bradford)] was not satisfied with the services being provided by the supplier, and he . . . asked Rumbley to intercede and get issues resolved on numerous occasions." (Id.) According to May, "Rumbley failed to take ownership of [Bradford's] consumables contract and did not help to mitigate or resolve the situation." (Id.).

Rumbley became pregnant twice in 2008 while working under May. Her first pregnancy, which lasted approximately eight weeks or less, ended in a miscarriage on March 14, 2008. (Doc. 28-3, pp. 24-26 (Rumbley Dep. 77:23-78:5; 79:20-23)). During the first pregnancy, Rumbley told May that she was expecting. (Id., pp. 25-26 (Rumbley Dep. 78:18-79:23)). When she miscarried, Rumbley missed work. (Id., p. 27 (Rumbley Dep. 84:1-15)). Upon her return to work following the miscarriage, Rumbley asked May if she could fill out a slip for sick leave and

---

[3] May indicated in his deposition that the complaints from Jackson and Schaus occurred during February-March. (Doc. 21-2, p. 70 (May Dep. 70:10-22)).

asked May to sign her sick leave slip. (Id., pp. 27-28 (Rumbley Dep. 84:13-85:20)). At that point, May told Rumbley "that he didn't want [her] to start abusing [her] sick leave. And he asked if [she and her partner] were going to try again." (Id.; Doc. 21-8, p 2 (EEOC Charge of Discrimination) ("After my miscarriage . . . May[] questioned me about my future intentions on becoming pregnant again")). Rumbley responded, "I apologize, Dan. . . . I should have planned on having a miscarriage so I could have taken a vacation day in advance." (Doc. 28-3, pp. 27-28 (Rumbley Dep. 84:13-85:20)).

May stated in his affidavit that in mid- to late-March he began to consider putting Rumbley on a Performance Improvement Plan ("PIP") . (Doc. 21-5, pp. 18-19 (May Dep. 132:18-133:1); Doc. 21-2, p. 6 (May Aff. ¶ 11)). May indicated that he believed a PIP might be required to "get Pauline on the right track" because "she wasn't taking [his] counseling and . . . management appraisals." (Doc. 21-5, pp. 9-10 (May Dep. 83:18-85:3)). Feedback from "internal customers" and May's "personal observations on . . .[Rumbley's] responsiveness to questions [and . . . ] tasks he assigned her" also fueled May's concern. (Id.).

On March 31, 2008, May emailed Schroeder: "As discussed I want to challenge Pauline to become more strategic . . . . Here is a seminar we can ask her to attend. Please approve and I'll give her date options for the seminar." (Doc. 21-2, p. 31 (Email from May to Schroeder)). May stated in his affidavit in connection with this litigation that he "recommended that [Rumbley] attend [this] three-day [contracts] training seminar (paid for by Austal) to assist her in the transition to a more modern supply chain management department and to help her get where she needed to be overall" because he "recognized that Rumbley was experiencing difficulties with the demands of a modern supply chain management department and with the duties that she had even before the shift from tactical to strategic purchasing was made." (Doc. 21-2, p. 5 (May

Aff. ¶ 7)). According to May, "Rumbley was still having trouble writing the purchase orders that she had been required to write even before she was moved to my supervision in the new supply chain management department." (Id.). Rumbley attended the training on April 28-30, 2008. (Id., pp. 38-42 (Email correspondence between Rumbley and May; travel records)).

On April 2, May assigned Rumbley a strategic purchasing project ("SPP"), the purpose of which was to reassess Austal's major equipment rental situation, and specifically "to reduce the stagnant time that equipment was not being . . . utilized[, and] to reduce cost." (Doc. 28-3, pp. 35-42 (Rumbley Dep. 126:1-136:4); accord Doc. 21-5, p. 36 (May Dep. 246:5-247:20)). May indicated that he assigned the project to Rumbley because she was the most senior agent on his staff and he thought that the project would serve as a means through which Rumbley could show "that she had strategic process ability." (Doc. 21-5, pp. 37-38 (May Dep. 268:2-269:12)).

Rumbley does not recall the initial due date for the SPP. (Doc. 28-3, pp. 42-45 (Rumbley Dep. 133:11-136:23)). The SPP itself indicates that the "spreadsheet with all data and bids and recommendations" was to be presented to May on a date "TBD." (Id.). In an email to May on April 4, 2008, however, Rumbley indicated that she "planned to have all the information, including the bid proposal and estimated equipment needed . . . for [review] on May 23, 2008." (Id.). The deadline was "extended a couple of times" in recognition of the fact that [Rumbley] was "working on other projects," including fellow employees' "responsibilities [that Rumbley took on] along with [her] own" after the "other procurement people were taken off of their projects for a . . . joint high speed bid." (Id.). In addition, there is evidence that May was out of the office on a cruise on one of the due dates. (Id.).

When he assigned the SPP, May sent Rumbley "a detailed outline of the [strategic purchasing] project, which was approved by Terry Schroeder." (Doc. 21-2, pp. 4 & 10 (May

Aff. ¶ 6 & Exh. A (Email correspondence between Schroeder and May)). However, according to Rumbley, May failed to provide Rumbley with an accurate equipment inventory to facilitate her completion of the project, despite the fact that part of her assignment was to "us[e] the site inventory [to] author a comprehensive RFP . . . [and a]nalyze current inventory of equipment on site [to] determine what is needed and what is surplus." (Doc. 28-3, pp. 35-42 (Rumbley Dep. 126:1-133:5); Doc. 21-1, p. 65 (Strategic Project Assignment)). Rumbley attempted to go "out into the yard and t[ake her own] inventory of the equipment." (Doc. 28-3, pp. 35-42 (Rumbley Dep. 126:1-133:5)). However, "70 percent of [it did] not [have] the correct VIN number." (Id.). In other words, certain of the information necessary to complete the project of "reduc[ing] the stagnant time that equipment was not being . . . utilized . . . was difficult information to get in the first place, because there was really no history on how long this equipment would be needed . . . except for [one] completely inaccurate" spreadsheet. (Id.).

On or about April 7, 2008, "it was brought to [May's] attention that Schaus had circumvented Rumbley to expedite an order that she had placed for him." (Doc. 21-2, p. 6 (May Aff. ¶ 9); Doc. 21-5, p. 40 (Email from Kirsten Bradford, née Marks, to Schaus, copying May and others). May indicated in his affidavit that on April 8 or 9, after the problem with Schaus circumventing Rumbley was brought to his attention, May contacted then-Austal HR Director Jeff O'Dell ("O'Dell") and asked him to provide May with "an outline of what a Performance Improvement Plan (PIP) needed to look like, as [he] was [still] considering putting Rumbley on one at that time." (Doc. 21-2, p. 6 (May Aff. ¶ 11); see also Doc. 21-5, p. 40 (Email correspondence between May and O'Dell)).

Rumbley became pregnant again during March or early April, 2008. (Doc. 28-3, pp. 29-31 (Rumbley Dep. 90:11-92:5)). Rumbley informed May on April 10, 2008, that she was

8

expecting again. (Id., p. 31 (Rumbley Dep. 92:14-21); Doc. 21-1, p. 72 (Rumbley Handwritten Notes); Doc. 21-8, p 2 (EEOC Charge of Discrimination)). May responded by saying: "Look around, how many pregnant women do you see?". (Doc. 28-3, pp. 32-33 (Rumbley Dep. 98:8-99:9); Doc. 21-1, p. 72 (Rumbley Handwritten Notes); Doc. 21-8, p 2 (EEOC Charge of Discrimination)). Rumbley replied "None." (Id.). And then, according to Rumbley, May "said something about keeping it that way . . . [, w]e plan on keeping it that way[, or] we should keep it that way." (Id.).

On April 18, 2008, May presented Rumbley with a Performance Improvement Plan in the presence of Austal HR employee Stephanie Pate ("Pate"). (Doc. 28-3, pp. 46-47 (Rumbley Dep. 138:11-139:7); Doc. 27, p. 3). At the outset of the meeting at which May presented Rumbley with the PIP, "[h]e told [Rumbley that] this [wa]s not up for discussion or debate." (Id., pp. 46-47 (Rumbley Dep. 138:11-139:7)) As a result of this admonishment, during the April 18 meeting Rumbley did not ask any questions regarding the PIP or respond in any way to her new assignment. (Id.).

Shortly after being placed on the PIP, however, Rumbley visited Pate, who instructed her to speak with O'Dell. (Doc. 28-3, pp. 64-67 (Rumbley Dep. 186:2-189:15)). Rumbley did, and told O'Dell that she felt she was being harassed. (Id.). O'Dell responded by asking Rumbley, "[w]ho's going to believe you" regarding your pregnancy harassment allegations? (Id.). Rumbley related to O'Dell May's comments regarding her sick leave and "pregnant women in the yard." (Id.). O'Dell replied, "Well, pretty much it would be [Rumbley's] word against . . . theirs." (Id.).

On May 2, Rumbley and May met in May's office to discuss the PIP. (Doc. 21-1, p. 74 (Rumbley Handwritten Notes)). During the meeting, Rumbley told May that she "didn't agree

with what was written and [she] felt like she was being discriminated against and . . . [that] they were trying to get rid of me because of the pregnancy." (Id.). May "nodded [h]is head in agreeance [*sic*] and said, 'I hope you don't think it's me.'" (Id.). Rumbley responded: "w[h]e[]ther it[']s you or upper management I think it[']s wrong because I've worked so hard." (Id., pp. 74-75).

On May 19, Rumbley and May met again. (Id., p. 75). May remarked during the meeting that "even if they had to pay for maternity leave[,] then [Rumbley] sure as hell wouldn't have a job when [she] came back." (Id., p. 76; Doc. 21-1, p. 46 (Rumbley Dep. 211:13-22)). By "they," Rumbley supposed May meant Austal. (Doc. 21-1, p. 46 (Rumbley Dep. 211:13-22)).

On or about June 18, 2008,[4] Rumbley went to Austal HR employee Sandra Koblas ("Koblas") and requested that Austal transfer her to another department "because of . . . pregnancy harassment" she was experiencing. (Doc. 28-3, pp. 48-51 (Rumbley Dep. 153:9-156:20)). Rumbley explained that she approached Koblas regarding the transfer because she had "already been to Stephanie and Jeff O'Dell," and "Sandra Koblas was fairly new." (Id.). Rumbley indicated to Koblas, as she had to Pate and O'Dell, that she thought she was being discriminated against based on her pregnancy. (Id.). Rumbley specifically told Koblas that she believed she had been placed on the PIP because of her pregnancy and that "the project . . . was virtually impossible. The Performance Improvement Plan was trumped up." (Id.). Rumbley asked Koblas "if there was anything [she] could do." (Id.). Koblas informed Rumbley "that there was no way [she] could transfer to another department because . . . of the Performance Improvement Plan that Dan had put me on." (Id.). Rumbley inquired particularly about

---

[4] Plaintiff stated that she approached Koblas approximately two weeks before her termination, which occurred on July 2, 2008. (See Doc. 28-3, pp. 48-51 (Rumbley Dep. 153:9-156:20); Doc. 28-4, p.2 (Austal Employee Change of Status Form)).

10

transferring to an "HR administrative secretary-type position that was available" at Austal. (Id.). Koblas pointed out that the position "was beneath [Rumbley's] job skills [and] would [entail] a considerable pay decrease." (Id.). When Rumbley responded that "she didn't care [because] at least [she] would still be employed," Koblas "said that she couldn't . . . help [Rumbley] because of the Performance Improvement Plan" and that "even if [Rumbley] did apply, [she] would not be considered . . . because of the Performance Improvement Plan." (Id.).

On June 25, 2008, May emailed O'Dell, copying Schroeder. (Doc. 28-9, p. 2 (Email from May to Odell)). The email was labeled "Pauline Rumbley," and two documents labeled "Pauline Rumbley – PIP 4-18-2008.doc" and "PIP assessment-Final 1-Pauline Rumbley.doc" were attached. The email metadata indicates that the email was flagged for follow-up by Thursday, June 26, 2008 at 12:00 AM. May wrote:

> Jeff,
>
> I anticipate letting Pauline go Thursday July 3rd.
>
> Pauline was presented with a PIP . . . on Friday April 18th 2008 and witnessed by Stephanie Pate, copy attached. She found out she was pregnant and announced May 1st 2008.
>
> A review of her PIP was held May 22nd (an extension was granted past the 30 days originally required), and I reviewed with Pauline, copy attached.
>
> . . . .
>
> The assessment indicated the PIP was not satisfactory. I told Pauline that a final decision would not be made on her status due to an ongoing strategic project she is currently working on (material and access equipment rental).
>
> This has been extended until this Friday (6/27), due to her having to cover for co-workers on vacation.
>
> I reiterated what Pauline has been told numerous times that with the implementation of Austal's ERP system there will be a greater

11

> emphasis on strategic purchasing as daily tactical duties will be diminished.
>
> Pauline has herself admitted to me that she is having trouble with strategic oriented projects and commented that she never seems to "get it right" no matter how much effort and time she expends.
>
> As discussed, I have yet to schedule a year end performance review with Pauline and all are due 6/27. Please advise how you want to handle this.
>
> Jeff—As a side note to this situation . . .
>
> Pauline does work hard and could conceivably be a productive team member to Austal in another position. She will not be able to continue in Supply Chain due to her continuing problems with Strategic Supply Chain requisites.
>
> Is there a possibility she can be reassigned to another department?
>
> Please advise how you want me to proceed.

(Id.). May stated in his deposition that he mentioned the fact that Rumbley was pregnant because he "was concerned if [Austal] had to let her go that . . . it would present a financial hardship to her family." (Doc. 28-2, pp. 23-24 (May Dep. 258:12-259:20)).

On June 27, Rumbley emailed May regarding the SPP, attaching spreadsheets containing heavy equipment bid information. (Doc. 21-1, pp. 90-99 (Email from Rumbley to May and attached spreadsheets)). The email stated: "Please review the following. I need further direction, but I would like to send out a request for 'best and final' next week." (Id.). According to May, this transmission did not amount to a "completed strategic project that addressed everything that needed to be addressed and was all-inclusive." (Doc. 21-5, p. 35 (May Dep. 241:20-243:19)).

Plaintiff was terminated effective July 2, 2008. (Doc. 28-4, p. 2 (Austal Employee Change of Status Form)). May and O'Dell signed Rumbley's termination form. (Id.). Schroeder's name does not appear on the document. (Id.). Although O'Dell was present at

Rumbley's termination meeting "because he was the Human Resources Director," (Doc. 21-2, p. 8 (May Aff. ¶ 15)), and O'Dell informed Rumbley personally during her termination meeting that she was being terminated (Doc. 28-3, pp. 76-77 (Rumbley Dep. 227:9-228:15)), according to May's statement in his affidavit, O'Dell "was not involved in the decision to terminate Rumbley." (Doc. 21-2, p. 8 (May Aff. ¶ 15)). Schroeder did not attend Rumbley's termination meeting and did not sign her termination form. (See Doc. 28-3, pp. 76-77 (Rumbley Dep. 227:9-228:15) & Doc. 28-4, p. 2 (Austal Employee Change of Status Form)).

The termination form identifies "Performance Issues—not meeting expectations" as the reason for Rumbley's termination. (Doc. 28-4, p. 2 (Austal Employee Change of Status Form)). May stated generally regarding Rumbley's performance: "Rumbley had significant difficulties even grasping the general concept of strategic purchasing . . . . She also had performance issues with her other job duties, and her co-workers did not have similar struggles." (Doc. 21-2, p. 4 (May Aff. ¶ 5)). Although none of the other employees in the group that May and Rumbley worked in received the additional benefit of the training seminar that Rumbley attended, according to May, "the other employees were transitioning at a much faster pace than Rumbley." (Doc. 21-2, p. 5 (May Aff. ¶ 7)). May also indicated that "Rumbley . . . had problems with timely performance of her duties. She had a problem with keeping up a daily log that [May] had asked her to keep in order to track orders," as well as "problems with time management and setting priorities regarding projects." (Id., pp. 6-7 & 45 (May Aff. ¶ 12 & Email from May to Rumbley)).[5] May stated in his affidavit that because "Rumbley simply could not handle the

---

[5] In response to May's claims about her problems with timely performance, time management, and setting priorities, Rumbley points to her response to the email May cites in support of these claims. In the email, Rumbley portrays the issues May enumerated as a series of "miscommunication[s]." (See Doc. 28-8, p. 2 (Email correspondence between Rumbley and May)).

demands of Austal's restructured purchasing model and still could not adequately perform her job duties that had not changed when she moved to my supervision," he "ultimately made the decision to terminate her, which was approved by . . . Schroeder." (Id., p. 8 (May Aff. ¶ 15)).

Jean Michon ("Michon"), a female Senior Subcontracts Agent "replaced the plaintiff[/] assumed her job duties and responsibilities" following Rumbley's termination. (Doc. 28-10, p. 3 (Def.'s Resp. to Pl.'s First Interr. and Req. for Prod.)). The record contains no evidence that Michon was pregnant when Austal hired her or has become pregnant during her tenure at Austal.

## III. Analysis

### A. Disparate Treatment Claim

When considering a pregnancy discrimination claim, this Court applies "the same type of analysis used in other Title VII sex discrimination suits." Sampath v. Immucor, Inc., 271 Fed. Appx. 955, 960 (11th Cir. 2008) (per curiam) (quoting Armindo v. Padlocker, Inc., 209 F.3d 1319, 1320 (11th Cir. 2000) (per curiam)). As with "other Title VII cases, a plaintiff may use either direct or circumstantial evidence to establish disparate treatment discrimination." Id. (citing Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

The Eleventh Circuit "defines direct evidence of discrimination as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Wilson, 376 F.3d at 1086 (internal quotation marks omitted) (quoting Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1357 (11th Cir. 1999) and Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998)). The Court of Appeals' "precedent illustrates [that] only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor, constitute direct evidence of discrimination." Wilson, 376 F.3d at 1086. (internal quotation marks

14

omitted) (quoting Rojas v. Florid, 285 F.3d 1339, 1342, n. 2 (11th Cir. 2002) and Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989)). That is, "[i]f the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." Wilson, 376 F.3d at 1086 (citing Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997) (rejecting contention that a statement that "allows an inference of discrimination, but [also] permitted a] factfinder [to] infer reasonably that the statement was nothing more than an observation of a fact" constituted direct evidence). However, "[w]here the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)). The Court of Appeals has

> defined direct evidence as "evidence, which if believed, proves existence of fact in issue without inference or presumption." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987) (citation, emphasis and brackets omitted). Evidence that only suggests discrimination, see Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, see Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1083 n. 2 (11th Cir.1996), does not constitute direct evidence. In a long line of cases, this Court has found direct evidence where "actions or statements of an employer reflect[ ] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir.1990). See Haynes v. W.C. Caye & Co., Inc., 52 F.3d 928, 930 (11th Cir.1995) (holding that statement questioning whether "sweet little old lady could get tough enough" to do job and statement that "a woman was not competent enough to do this job" constitute direct evidence); Burns v. Gadsden State Community College, 908 F.2d 1512, 1518 (11th Cir.1990) (holding that statement that "no woman would be named to a B scheduled job" constitutes direct evidence); Caban-Wheeler, 904 F.2d at 1555 (holding that defendant's statement that program needed a black director constitutes direct evidence); E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 923 (11th Cir.1990) (holding that general manager's

statement that "if it was his company, he wouldn't hire any black people" and production manager's statement that "you people can't do a ---- thing right" constitute direct evidence); . . . ; Sennello v. Reserve Life Ins. Co., 872 F.2d 393, 394, 395 (11th Cir.1989) (holding that statement that "we can't have women in management" constitutes direct evidence); Walters v. City of Atlanta, 803 F.2d 1135, 1141-42 (11th Cir.1986) (holding that memorandum requesting a new list of candidates because "current register ... does not include any minority group representation" constitutes direct evidence); Wilson v. City of Aliceville, 779 F.2d 631, 633, 636 (11th Cir.1986) (holding that mayor's statement that "he wasn't gonna let no Federal government make him hire no god-dam nigger" constitutes direct evidence); Thompkins v. Morris Brown College, 752 F.2d 558, 561, 563 (11th Cir.1985) (holding that college president's statement that he saw no reason for a woman to have a second job and statement that males had families and needs that female plaintiff did not constitute direct evidence); Miles v. M.N.C. Corp., 750 F.2d 867, 874-75 (11th Cir.1985) (holding that plant manager's statement that he wouldn't hire blacks because "[h]alf of them weren't worth a shit" constitutes direct evidence); Bell v. Birmingham Linen Serv., 715 F.2d 1552, 1553, 1557 (11th Cir.1983) (holding that supervisor's statement that he would not put woman in washerman position because "every woman in the plant would want to go into the washroom" constitutes direct evidence); but see Harris, 99 F.3d at 1082, 1083 n. 2 (holding that statement that "under the circumstances we did not need to employ a black at Thompson High School" open to more than one interpretation and thus not direct evidence).

Merritt, 120 F.3d at 1189-90 (finding direct evidence of retaliation sufficient to avoid summary judgment). In addition to the cases cited by the Eleventh Circuit in Merritt, courts have identified evidence supporting a finding of discrimination in a variety of factual contexts. See Buckley v. Hosp. Corp. of America, Inc., 758 F.2d 1525, 1530 (11th Cir. 1985) (finding evidence from which a reasonable jury could conclude that defendants acted with discriminatory intent in violation of the ADEA based in part on new hospital administrator's "expression of surprise at the longevity of the staff members, . . . indications that the hospital needed 'new blood' and that he intended to recruit younger doctors and nurses, and his comment on plaintiff's 'advanced age'" combined with the fact that "the two individuals who ultimately absorbed the

16

bulk of her duties were more than 15 years her junior"). The Eleventh Circuit has considered relevant whether the comments in question specifically address or were made in the context of the challenged employment action, as well as whether they were uttered by the decisionmaker(s). See Tran v. The Boeing Co., 190 Fed. Appx. 929 (11th Cir. 2006); Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002) (per curiam); Standard v. ABEL Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (ADEA case holding that "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.")

Regarding pregnancy specifically, this court has held that "[i]f a plaintiff can demonstrate that her termination was prompted by her pregnancy, then 'the ultimate issue of discrimination is proved.'" Ferrell v. Masland Carpets, Inc., 97 F. Supp. 2d 1114, 1122 (S.D. Ala. 2000) (Vollmer, J.) (quoting Bell, 715 F.2d at 1556) (where the "sole offer of direct evidence [wa]s Alvin Simmons's deposition testimony that he feared that an unborn child could become strangled by the umbilical cord if the mother raised her arms too high," which would "require the court to infer that [an employee's] belief in an old wives tale somehow motivated [another employee's] decision to terminate Ferrell," such could not be considered direct evidence, which "does not require such an inferential leap."). By way of example, the court in Ferrell pointed to EEOC v. Wal-Mart Stores, Inc., 156 F.3d 989 (9th Cir. 1998), in which the Ninth Circuit held that "a statement by an assistant store manager to a plaintiff that 'we won't be hiring you . . . because of the conditions of your pregnancy' and that '[y]ou're welcome back after you've had the baby,' is direct evidence of pregnancy discrimination." Ferrell, 97 F. Supp. 2d at 1123 (quoting EEOC v. Wal-Mart Stores, Inc., 156 F.3d at 990-92). By contrast, "a comment by a partner of a law firm to a plaintiff that 'if you were my wife, I would not want you working after

17

having children,' does not constitute direct evidence of pregnancy discrimination concerning the firm's decision to terminate the plaintiff after her pregnancy." Ferrell, 97 F. Supp. 2d at 1123 (quoting Kennedy v. Schoenberg, Fisher, & Newman, Ltd., 140 F.3d 716, 724 (7th Cir. 1998)).

Rumbley presents sufficient direct evidence of discrimination to avoid summary judgment on her disparate treatment claim. For example, the evidence includes May's alleged statements to Rumbley upon learning of her second pregnancy: "Look around, how many pregnant women do you see?". After Plaintiff answered, "None," May allegedly stated something to the effect of to "we plan on keeping it that way." Rumbley's testimony that May affirmed that Austal was "trying to get rid of [Plaintiff] because of the pregnancy" also constitutes direct evidence of discrimination. Perhaps the most direct evidence of May's discriminatory intention to terminate Rumbley arose during a meeting just over six weeks before Plaintiff was terminated. At that May 19 meeting, May allegedly remarked that "even if they had to pay for maternity leave[,] then [Rumbley] sure as hell wouldn't have a job when [she] came back."

These statements and actions constitute evidence that Rumbley's "termination was prompted by her pregnancy." See Ferrell, 97 F. Supp. 2d at 1122. They are precisely the type of "blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor, [that] constitute direct evidence of discrimination." Wilson, 376 F.3d at 1086; Rojas v. Florid, 285 F.3d at 1342, n.2; Carter, 870 F.2d at 582. May's communications regarding Rumbley's pregnancy are not "subject to more than one interpretation," see Harris v. Shelby County Bd. of Educ., 99 F.3d at 1083 n. 2, and "no reasonable factfinder could conclude "that the statement[s] w[ere] nothing more than [ ] observation[s] of a fact." Wilson, 376 F.3d at 1086 Indeed, they amount to "direct evidence of discrimination as evidence which reflects a

discriminatory . . . attitude correlating to the discrimination" of which Rumbley complains. See Wilson, 376 F.3d at 1086; Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d at 1357; Carter v. Three Springs Residential Treatment, 132 F.3d at 641; Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir.1990). As such, the evidence Rumbley presents is the kind of evidence that, "if believed by the jury, would be sufficient to win at trial," such that "summary judgment is not appropriate even [though] the movant presents conflicting evidence." Merritt., 120 F.3d at 1189; Mize, 93 F.3d at 742. Accordingly, summary judgment is **DENIED** with respect to Rumbley's disparate treatment claim.

### B. Retaliation Claim

It is not as clear that the direct evidence supporting Rumbley's disparate treatment claim provides support sufficient for Rumbley to avoid summary judgment on her claim of retaliation. None of May's comments regarding Plaintiff's pregnancy necessarily reflect a "retaliatory attitude correlating to the . . . retaliation complained of by the employee." See Wilson, 376 F.3d at 1086; Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d at 1357; Carter v. Three Springs Residential Treatment, 132 F.3d at 641; Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir.1990). However, Rumbley may avoid summary judgment if she presents sufficient circumstantial evidence of retaliation. The matter is **CARRIED to trial.**

### C. Remaining Motions

**Defendant's motion to strike (Doc. 29) is GRANTED in part** and **DENIED in part.** The motion is granted to the extent that it seeks to strike: (a) Plaintiff's Response to Defendant's Determinations of Undisputed Fact [and] Conclusions of Law and Plaintiff's Undisputed Facts (Doc. 26), which is not permitted under Local Rule 7.2(b); and (b) Plaintiff's summary in its opposition brief of deposition testimony about certain individuals no longer employed by Austal

(see Doc. 27, p. 26, n.7). The Defendant claims (see Doc. 29, p. 12) and the Plaintiff does not dispute (see Doc. 32) that the summarized deposition testimony was designated confidential and subject both to the Joint Confidentiality Agreement and Protective Order entered in this matter (Doc. 12) and Judge Bivins' order. The remainder of Defendant's motion to strike is denied as moot. The foregoing analysis does not rely on any of the evidence to which Defendant takes exception, as the evidence is cumulative, irrelevant, and/or unincorporated in Plaintiff's opposition brief.

**Plaintiff's motion to strike (Doc. 32)** is **DENIED as moot.** The foregoing analysis does not rely on any of the evidence to which Plaintiff takes exception, as the evidence is cumulative and/or irrelevant.

## III. Conclusion

As set out, Defendant's motion for summary judgment (Doc. 20) is **DENIED in part** and **CARRIED to trial in part**, Defendant's motion to strike (Doc. 29) is **GRANTED in part** and **DENIED in part**, and Plaintiff's motion to strike (Doc. 32) is **DENIED as moot**.

**DONE** and **ORDERED** this the **12th** day of **November, 2010.**

                        s/ Kristi K. DuBose
                        **KRISTI K. DuBOSE**
                        **UNITED STATES DISTRICT JUDGE**